IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FUTURE FIBRE TECHNOLOGIES PTY. LTD. | : : : | CIVIL ACTION |
| v. | : : | |
| OPTELLIOS, INC. | : | NO. 09-346 |

MEMORANDUM

Dalzell, J.[1]  August 15, 2011

Plaintiff/counter-defendant Future Fibre Technologies Pty. Ltd. ("FFT") has sued defendant/counter-claimant Optellios, Inc. ("Optellios") for correction of inventorship pursuant to 35 U.S.C. § 256 (Count I) and for infringement of U.S. Patent No. 7,142,736 (the "'736 Patent") pursuant to 35 U.S.C. § 271. Optellios has countersued FFT seeking to enforce the parties' prior settlement agreement (Count I), and for patent infringement (Count II).

We will herein address Optellios' motion to enforce the settlement agreement that it filed in a previous iteration of this case, and that we have deemed filed in this case. We will also dispose of FFT's motions to compel discovery.

I.  Factual Background

FFT, an Australian corporation, develops, manufactures, and installs fiber-optic intrusion detection systems in facilities around the world. Compl. ¶ 2, 5. FFT's products use optical fibers to detect movement, vibration, pressure, temperature, or sound. Compl. from D. Del. Civil Action No. 04-

---

[1] Sitting by designation of Chief Judge McKee pursuant to 28 U.S.C. § 292(b).

1501 ("Prev. Compl.") ¶ 11.  Optellios is a Delaware corporation with its principal place of business in Langhorne, Pennsylvania.  Compl. ¶ 3.  Optellios also develops fiber optic sensors for use in a variety of applications, including intrusion detection.  Answer ¶ 7.

In 2003, Optellios supplied FFT with sample polarization controllers.  Prev. Compl. ¶ 26.  At that time, Optellios had not yet entered the market for fiber optic security systems.  Id.  In May of 2003, the parties explored the possibility of Optellios supplying components for FFT's systems and entered into a confidentiality agreement to facilitate the exchange of technology between the two companies. Id. ¶ 27, 30.  Later that year, FFT provided technical and marketing information to Optellios regarding FFT's optical fiber security systems while continuing to purchase polarization controllers from Optellios.  Id. ¶ 30.

In January of the following year, Optellios suggested that the companies consider a closer relationship that would include sharing jointly-developed intellectual property and even a possible merger.  Id. ¶ 28.  Optellios requested additional technical information, allegedly better to understand how FFT's fiber optic security systems worked.  Id. ¶ 30.  Optellios did not tell FFT that it was trying to develop its own fiber optic security system.  Id.

In 2004, the relationship between the two companies broke down.  Id. ¶ 32.  FFT sued Optellios, asserting

2

misappropriation of trade secrets, violation of the Lanham Act, unfair competition and deceptive trade practices, breach of contract, and fraud. Id. ¶¶ 35-71. FFT claims that the only patents at issue in this previous litigation were two patents that the Patent and Trade Office ("PTO") had granted it -- U.S. Patent Nos. 6,621,947 and 6,778,717. FFT's Suppl. Opp. to Optellios' Mot. to Enforce Settlement Agreement ("FFT Mem.") at 4. In that lawsuit, FFT alleged that Optellios had misappropriated confidential and proprietary materials that it had acquired from FFT during their discussions in 2003 and 2004 to enter into the possible joint venture involving fiber optic security systems.

   Optellios answered and counterclaimed, but before extensive discovery had occurred the parties settled their claims (the "Settlement Agreement"). Judge Jordan, while still a District Judge, adopted the parties' stipulation dismissing the case with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(ii). Future Fibre v. Optellios Inc., C.A. No. 04-1501 (D. Del. Aug. 4, 2005). The stipulation also stated that "[f]ederal court jurisdiction is hereby retained as to all matters relating to the interpretation, administration, and consummation of the parties' Joint Settlement Agreement and Mutual Release." Def. and Counterclaimant Optellios, Inc.'s Suppl. Br. in Supp. Of its Mot. to Enforce Settlement Agreement ("Def. Mem."), Ex. 6.

   Meanwhile, between January and July of 2004, Optellios filed a series of provisional patent applications. Compl. ¶¶ 23-

3

30.  On August 16, 2004, it filed a nonprovisional patent application based on the previous provisional patent applications that the PTO had allowed, and the patent issued on November 28, 2006 as the '736 Patent.  The '736 Patent lists Jayantilal Patel, Zhizhong Zhuang, and Yuri Zadorozhny as its inventors.  Id. ¶¶ 31-32.

On July 25, 2008, FFT filed suit against Optellios in the Middle District of Florida.  Del. C.A. No. 09-346, Docket Entry # 1.  In that suit, FFT alleged that the '736 Patent listed the wrong inventors, and that the proper inventors were actually FFT personnel who had assigned all of their rights to FFT.  Compl. ¶ 6, 32.  FFT sought to correct the inventorship of the '736 Patent, and sued Optellios for infringing on that patent.  Optellios answered and counterclaimed on September 10, 2008.  Del. C.A. No. 09-346, Docket Entry # 26. Optellios argued that FFT's suit was barred by the release in the previous action, and sought judgment in its favor on this ground.  FFT answered the counterclaims on September 30, 2008.  Id., Docket Entry # 43.

Two days later, Optellios moved to transfer the case to the District of Delaware and moved for judgment on the pleadings.  Id., Docket Entry # 44, 45.  On January 14, 2009, Optellios filed a motion to bifurcate the proceedings related to FFT's inventorship claim, its infringement claim, and the issue of the release.  Id., Docket Entry # 64.

On March 23, 2009, Optellios filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative,

4

a renewed motion to transfer venue. Id., Docket Entry # 80. Optellios argued that the District of Delaware's retention of exclusive jurisdiction meant that the Middle District of Florida did not have subject matter jurisdiction over the 2008 patent complaint, or (alternatively) that the forum selection clause of the Settlement Agreement meant that Delaware was the more appropriate venue. Id.

On March 27, 2009, Optellios filed its motion to enforce the Settlement Agreement and for an anti-suit injunction in the District of Delaware. Del. C.A. No. 04-1501, Docket Entry # 41. Optellios sought to enjoin FFT from litigating its claim in Florida and also to reopen the earlier Delaware case before Judge Jordan in order to determine whether the terms of the Settlement Agreement cover the claims asserted in the Florida litigation.

On April 8, 2009, the Florida case was finally assigned to "visiting" Judge Marilyn L. Huff of the Southern District of California, Del. C.A. No. 09-346, Docket Entry # 86. Judge Huff heard oral argument on April 17, 2009, and ruled on the outstanding motions on May 7, 2009. Id., Docket Entries # 101, # 102, # 104. Judge Huff denied Optellios's motion for judgment on the pleadings. Id., Docket Entry # 101. She held that the release contained in the Settlement Agreement was not "central to the plaintiff's claim" because the complaint does not reference the release and the claims do not rely on it, and, instead, the release forms the basis of an affirmative defense the defendant raised in its answer. Id. at 4 (citing Horsley v. Feldt, 304 F.3d

5

1125, 1134 (11th Cir. 2002)).² Judge Huff granted Optellios's motion to transfer the case to Delaware. The case was duly transferred to the District of Delaware and assigned to us on May 20, 2009.

After disposing of several motions to compel discovery, we ordered the parties to complete discovery by November 22, 2010 and to file supplemental briefs in support of (or in opposition to) Optellios's motion to enforce the Settlement Agreement. After the close of discovery, FFT filed two more motions to compel, and both parties filed their supplemental briefs regarding Optellios's motion to enforce the Settlement Agreement. Because FFT chose to file its supplemental brief regarding Optellios's motion to enforce the Settlement Agreement instead of seeking an extension of time to do so pending resolution of the motions to compel, we will first address the motion to enforce the Settlement Agreement and then turn to FFT's motions to compel.

## II. The Motion to Enforce the Settlement Agreement

---

²Judge Huff determined that even if the release were central to the plaintiff's claim, she still could not grant judgment on the pleadings because the parties' intent controls the scope and effect of the release, and such intent was a question of fact. Id. at 5 (citing Corp. Prop. Assocs. 6 v. Hallwood Group, Inc., 817 A.2d 777, 779 (Del. 2003); Seaboard Coast Line R.R. Co. v. Trailer Train Co., 690 F.2d 1343, 1349 n.8 (11th Cir. 1982)). She also held that another question of fact existed as to the validity and enforceability of the release because Future Fibre averred in its answer to defendant's counterclaims that Optellios procured the release by fraud. Del. C.A. No. 09-346, Docket Entry # 101 at 4. We respectfully disagree with Judge Huff with regard to determining the scope of the release because we find the Settlement Agreement's language unambiguous.

Optellios filed the motion to enforce the settlement agreement in Civil Action No. 04-1501. Del. C.A. No. 04-1501, Docket Entry # 41. We then deemed that motion filed in this action and ordered the parties to complete discovery and file supplemental memoranda regarding the enforceability of the Settlement Agreement. See Docket Entry # 116 herein.

FFT argues that (1) the plain language of the Settlement Agreement does not bar FFT's claims, (2) the negotiation history of the Settlement Agreement confirms that the parties did not intend to release future claims, and (3) FFT's assertion of fraud in the inducement would require a trial because material facts are in dispute. Optellios counters that (1) FFT released the inventorship claim as part of the Settlement Agreement, (2) extrinsic evidence may not be used to interpret the agreement, and (3) FFT's fraudulent inducement defense fails as a matter of law.

Settlement agreements are construed according to traditional precepts of contract construction. In re Columbia Gas System, Inc., 50 F.3d 233, 238 (3d Cir. 1995). Here, Delaware law governs the parties' Settlement Agreement. Def. Mem., Ex. F ¶ 12. Under Delaware law, we seek to determine the parties' shared intent, "looking first at the relevant document, read as a whole, in order to divine that intent." MicroStrategy, Inc. v. Acacia Research Corp., No. 5735-VCP, 2010 WL 5550455, *5 (Del. Ch. Dec. 30, 2010) (internal quotation marks omitted). As part of that review, the Court interprets the words "using their

common or ordinary meaning, unless the contract clearly shows that the parties' intent was otherwise." Id. (internal quotation marks omitted).

When interpreting a contractual provision under Delaware law, we attempt to reconcile all of the agreement's provisions when read as a whole, giving effect to every term. Id. We will attempt to interpret the agreement in a manner that does not render any provision "illusory or meaningless." Id. If a settlement agreement's language is "clear and unambiguous," the ordinary meaning of the language generally will establish the parties' intent. Id. But a settlement agreement is ambiguous when the language "in controversy [is] reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Id. (internal quotation marks omitted). Ambiguity does not exist simply because the parties do not agree on the proper construction of the document. United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 830 (Del. Ch. 2007).

The parties agree that the language of the Settlement Agreement is clear and unambiguous, Def. Mem. at 16; FFT Resp. at 10. Delaware courts have held that "extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face." O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 289 (Del. 2001) (internal quotation marks omitted).

The Settlement Agreement contains the following release language:

>     FFT knowingly remises, releases, and forever
>     discharges OPTELLIOS from any and all claims,
>     notes, contracts, debts, agreements,
>     liability, actions, causes of action,
>     judgments, executions, demands, money
>     damages, attorneys' fees, witness fees,
>     costs, charges, expenses, other sums or
>     obligations, past and present, known or
>     unknown, asserted or unasserted, whether or
>     not ascertainable at the time of execution of
>     this Agreement concerning any act or omission
>     occurring prior to or on the date this
>     Agreement is executed, including, without
>     limitation, those alleged in the LITIGATION.
>     FFT expressly states and acknowledges that
>     the foregoing release is a general release
>     and is intended to convey the maximum
>     possible protection available to OPTELLIOS
>     under applicable law.

Def. Mem., Ex. F ¶ 4(b) (herein the "Release").

The Release also contains mutual covenants obliging the parties to (1) maintain the confidentiality of materials acquired from the other side, (2) not to challenge "any patent granted to or owned by the other Party as of the date of this Joint Settlement Agreement and Mutual General Release, including but not limited to, the '947 and '717 patents," and (3) not to file any lawsuit "for infringement of any patents granted to or owned by the parties or their principals held as of May 17, 2004, including but not limited to, the '947 and '717 patents." Id. ¶ 4(c).

FFT argues that the Settlement Agreement's Release applies only to claims that are "past or present" and "concern[ing] any act or omission occurring prior to or on the date this Agreement is executed." FFT Mem. at 1. Optellios disagrees, and essentially argues that the Release applies to

"past or present" claims or any claim "concerning any act or omission occurring prior to or on the date this Agreement is executed." Def. Mem. at 2.

A claim of patent infringement cannot be made until the patent actually issues. Amgen, Inc. v. Genetics Inst., Inc., 98 F.3d 1328, 1332 (Fed. Cir. 1996) ("of course suit can not be brought for infringement of a patent that has not issued"). Similarly, a claim seeking correction of inventorship under 35 U.S.C. § 256 cannot exist until the issuance of the patent. HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co., 600 F.3d 1347, 1353-54 (Fed. Cir. 2010) (no private cause of action to correct inventorship exists until patent issues, at which point § 256 provides for one).[3] By its terms, § 256 permits a court to order correction of inventorship only where "a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent. . . ." 35 U.S.C. § 256 (emphasis added).

Here, the '736 Patent did not issue until after the parties signed the Settlement Agreement. Thus, if the language of the Settlement Agreement shows that the parties did not intend to release claims arising out of actions that occurred before (but accruing after) they signed the Settlement Agreement, then

---

[3]For these reasons, Optellios's argument that FFT should have filed its own patent application after it became aware of Optellios's patent application for the '736 Patent to provoke an interference is a red herring because FFT's claims did not exist until the '736 Patent had issued.

FFT's lawsuit may proceed.[4]

Optellios relies on <u>Convey Compliance Sys., Inc. v. 1099 Pro, Inc.</u>, 443 F.3d 327, 332 (4th Cir. 2006), in support of its argument, but that case is inapposite. In <u>Convey</u>, the parties signed a release that stated that defendants released plaintiffs from "any claims . . . arising out of any actions or events occurring in whole or part prior to or concurrent with the date hereof." <u>Id.</u> at 330. A jury found, and the Fourth Circuit affirmed, that the defendants had breached their settlement agreement by filing suit against plaintiffs for a claim arising out of actions that took place before the settlement agreement had been signed (but where the claim did not accrue until after the settlement agreement had been signed). Optellios argues that the language of the Settlement Agreement here is equally as expansive as the one the parties signed in <u>Convey</u>. Def. Resp. at 6. We disagree. The language at issue in <u>Convey</u> is quite different from the language at issue here. As the Fourth Circuit noted, "[t]he release language not only covers all unknown claims, but all unknown claims accruing after the settlement date so long as they <u>arose out of</u> 'any actions or events occurring in whole or part prior to' the settlement agreement." <u>Convey</u>, 443 F.3d at 332 (emphasis added).

Here, the only claims released are those "<u>past and</u>

---

[4]We note here that the term "unknown" is not equivalent to the term "unaccrued." If a claim had accrued at the time that the parties signed the Settlement Agreement, but was "unknown" to one of the parties, <u>that</u> claim has been released.

11

present . . . concerning any act or omission occurring prior to or on the date this Agreement is executed." Def. Mem., Ex. F ¶ 4(b) (emphasis added). This is a much narrower release definition than "any claims, . . . known or unknown, arising out of any actions or events occurring in whole or part prior to or concurrent with the date [of the settlement]." 443 F.3d at 330. Here, the claims must be past or present; they cannot be future claims "arising out of" actions that happened before the Release was signed. The same discrepancy is present in the language of the settlement agreements in question in Press Mach. Corp. v. Smith R.P.M. Corp., 727 F.2d 781, 785-86 (8th Cir. 1984), and Noell Crane Sys. GmbH v. Noel Crane & Serv., Inc., 677 F. Supp. 2d 852, 868-70 (E.D. Va. 2009), two cases upon which Optellios also relies. In those cases, the settlement agreements released all claims based upon conduct that occurred before the settlement agreements were signed -- not just past and present claims.

In addition, the Court of Appeals in Press Mach. Corp. found that "[d]enying PMC the right to use the trade secrets and confidential information for which it had paid, would strip the agreement of much of its meaning." 727 F.2d at 785. That is emphatically not what happened here, where Optellios did not pay for the right to use the trade secrets FFT revealed. In fact, Optellios agreed not to "use such Proprietary Information for its own or a third party's benefit without prior written authorisation from the disclosing party." FFT Mem., Ex. 3 at 1.

Finally, relying on Augustine Med., Inc. v. Progressive

12

Dynamics, Inc., 194 F.3d 1367, 1373 (Fed. Cir. 1999), Optellios contends that the parties signed a "general release" and that "no exception to this rule should be implied for a claim whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation." Def. Mem. at 15 (quoting Augustine). Optellios argues that the onus of requesting such a reservation was on FFT to make, and that FFT made no effort to reserve its right to sue Optellios for correction of inventorship if Optellios patented the technology that Optellios allegedly stole. Id.

But in Augustine, the parties released any claims that either party "may have" -- language the Augustine court found to be prospective in nature. 194 F.3d at 1371 ("The phrase 'may have' is necessarily future-oriented . . . it implies a future possibility of Augustine having a claim"). There is nothing here to indicate that future claims were released, and thus we do not find that the parties in this case executed a "general release," as Optellios argues.

Optellios urges that nothing in the plain language of the Settlement Agreement suggests that a claim had to be actionable in a district court at the time of the Agreement's execution in order to be a "past or present" claim for the purposes of the Release. Def. Resp. at 13. Optellios argues that because FFT tried to provoke an interference on the '736 Patent at the PTO before that patent issued, correction of inventorship is a past or present claim. Optellios contends that

13

HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co., 600 F.3d 1347 (Fed. Cir. 2010), upon which FFT relies, actually cuts in Optellios's favor because in that case the Federal Circuit held that plaintiffs could pursue relief from the PTO while a patent application was pending.

But in HIF Bio, the Federal Circuit held that because the dispute involved pending patent applications the plaintiffs' requested relief of a declaration of the "true" inventor could only be granted by the Director of the PTO. Id. at 1353. This is not, however, a claim that may be brought in a district court. Id. ("Section 116 authorizes the Director of the Patent and Trademark Office to take certain actions concerning pending patent applications, but 'plainly does not create a cause of action in the district courts to modify inventorship on pending patent applications.'")

In fact, a request for correction of inventorship in a pending patent is not a "claim" at all, but rather a motion that must be filed before the PTO. Thus, the request for correction of inventorship in a pending patent and the claim for correction of inventorship in an issued patent are not the same thing -- and therefore a motion for correction of inventorship is not a "claim" in the sense that Count I of the complaint in this action is a "claim."

Thus, although FFT could have moved to correct the inventorship of the pending patent before the PTO, it had no actual claim to correct inventorship of the issued patent until

after the Settlement Agreement had been signed.  In short, FFT's <u>claim</u> of correction of inventorship pursuant to 35 U.S.C. § 256 did not accrue until the patent actually issued -- an event that did not occur until after the Settlement Agreement had been signed.  Thus, we reject Optellios's argument that we should view FFT's action to move for correction of inventorship while the '736 Patent application was pending before the PTO constituted a "claim".

Because we find no ambiguity in the language of the Settlement Agreement, we may not examine extrinsic evidence to determine the intent of the parties.  The parties clearly intended to release any claims that had accrued on or before the date of the Settlement Agreement and nothing more.

Future claims -- even those "arising out of" conduct that occurred before the parties signed the Settlement Agreement -- were not released and may properly be pursued at this juncture.  Thus, FFT may maintain claims regarding the '736 Patent, which did not issue until after the parties had signed the Settlement Agreement.  Because we find that the Settlement Agreement does not bar FFT's claims, we need not address FFT's assertion of fraud in the inducement of that contract.

Optellios argues that FFT does not have standing to assert its purported claim for infringement of the '736 Patent, and that its infringement counterclaim does not provide FFT with the right to a § 256 inventorship determination.  But these issues are outside the scope of its current motion to enforce the

15

Settlement Agreement, and therefore we will not address them here.

Finally, because we permitted the parties to conduct discovery only as it relates to the issue of Optellios's motion to enforce the Settlement Agreement, and because we will deny that motion, FFT's motions to compel discovery are now moot and we will deny them as such.

III. Conclusion

Based on the foregoing reasoning, we will deny Optellios's motion to enforce the Settlement Agreement, deny as moot FFT's motions to compel discovery, and direct the parties to appear in Chambers to determine a schedule for moving forward.